J-A10012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ANTHONY O. GUDINO | : | |
| | : | |
| Appellee | : | No. 2454 EDA 2017 |

Appeal from the Order Entered July 26, 2017
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001521-2016

BEFORE: GANTMAN, P.J., McLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY GANTMAN, P.J.: **FILED JULY 03, 2018**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Monroe County Court of Common Pleas, which granted in part the pretrial motion, filed on behalf of Appellee, Anthony O. Gudino, to exclude at trial certain evidence, per Pa.R.E. 404(b), as to Count 1 (Criminal Homicide), but deferred its ruling on the admissibility of the same evidence at trial as to Count 2 (Endangering Welfare of Children "EWOC") and Count 3 (Recklessly Endangering Another Person "REAP").[1] We affirm the order as to Count 1, but quash the appeal as to Counts 2 and 3.

The trial court opinion sets forth the relevant facts and procedural history of this case. Therefore, we have no need to restate them. The

_____

[1] 18 Pa.C.S.A. §§ 2501(a), 4304(a)(1), and 2705, respectively.

_____

* Retired Senior Judge assigned to the Superior Court.

Commonwealth filed a notice of appeal on July 28, 2017, with a certification that the trial court's order substantially handicapped or terminated the prosecution of the case against Appellee. **See** Pa.R.A.P. 311(d). The court ordered the Commonwealth, with service on August 1, 2017, to file a concise statement of errors complained of on appeal. The Commonwealth timely complied on August 7, 2017.

The Commonwealth raises the following issue on appeal:

DID THE TRIAL COURT ERR IN PRECLUDING THE COMMONWEALTH FROM INTRODUCING SPECIFIC INCIDENCES OF [APPELLEE]'S DOMESTIC VIOLENCE AND INTOXICATION WITHIN SEVERAL WEEKS OF THE HOMICIDE OF THE INFANT VICTIM TO SUPPORT THE *ACTUS REUS* AND *MENS REA* FOR THE CHARGES OF ENDANGERING THE WELFARE OF CHILDREN, AS A COURSE OF CONDUCT, AND RECKLESS[LY] ENDANGERING ANOTHER PERSON, AS WELL AS TO SHOW [APPELLEE]'S INTENT, STATE OF MIND, PRESENCE OF MALICE, ABSENCE OF ACCIDENT, AND MOTIVE?

(Commonwealth's Brief at 5).

As a prefatory matter, we consider whether the Commonwealth's appeal is properly before us for review. As a general rule, an appeal lies from a final order that puts the litigants out of court. **Commonwealth v Shearer**, 584 Pa. 134, 882 A.2d 462 (2005). **See also** Pa.R.A.P. 341 (defining final orders generally). "Ordinarily, pre-trial orders are considered interlocutory and not appealable." **Commonwealth v. Matis**, 551 Pa. 220, 230, 710 A.2d 12, 17 (1998). The Commonwealth, however, may take an appeal as of right from an order that does not end the entire case where the Commonwealth has

certified in its notice of appeal that the trial court's order will terminate or substantially handicap the prosecution. ***See*** Pa.R.A.P. 311(d). This exception applies to circumstances in which a pre-trial ruling results in the suppression, preclusion or exclusion of Commonwealth evidence. ***Shearer, supra*** at 141, 882 A.2d at 467 (citing ***Commonwealth v. Cosnek***, 575 Pa. 411, 836 A.2d 871 (2003)).

Pennsylvania Rule of Appellate Procedure 311(d) provides:

**Rule 311. Interlocutory Appeals as of Right**

\* \* \*

**(d) Commonwealth appeals in criminal cases.**—In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution.

Pa.R.A.P. 311(d). Our Supreme Court has explained:

The roots of the Rule are planted in the fundament of constitutional law: the Commonwealth has a never shifting burden to prove each element of the crime charged beyond a reasonable doubt. Constitutional due process requires that the government prove every fact necessary to constitute the crime beyond a reasonable doubt. The burden of proof never shifts but rests with the prosecution throughout. It is the continuing presumption of innocence that is the basis for the requirement that the state has a never-shifting burden to prove guilt of each essential element of the charge beyond a reasonable doubt.

When a pretrial motion removes evidence from the Commonwealth's case, only the prosecutor can judge whether that evidence substantially handicaps his ability to prove every essential element of his case. Additionally, only

the prosecutor can judge whether he can meet his constitutional burden of proving his case without that evidence.

*Cosnek, supra* at 416-17, 836 A.2d at 874-75 (internal citations and quotation marks omitted).

The certification by an officer of the [c]ourt guards against frivolous appeals or appeals intended solely for delay. This Court has held that the Commonwealth's certification is not contestable and in and of itself, precipitates and authorizes the appeal. This Court has since made clear that the Commonwealth may appeal a pre-trial ruling on a motion *in limine* which excludes Commonwealth evidence in the same manner that it may appeal an adverse ruling on a suppression motion—*i.e.*, by certification that the order has the effect of terminating or substantially handicapping the prosecution.

*Commonwealth v. Boczkowski*, 577 Pa. 421, 441, 846 A.2d 75, 87 (2004) (internal citations, quotation marks, and footnote omitted) (holding Commonwealth's good faith certification included in notice of appeal that trial court **order excluding** evidence from Commonwealth's case-in-chief would terminate or substantially handicap prosecution was sufficient to trigger Commonwealth's right to appeal). A "substantial handicap" exists whenever the Commonwealth is denied the use of all of its available evidence. *Id.* at 441 n.17, 846 A.2d at 87 n.17. *See also Commonwealth v. Gordon*, 543 Pa. 513, 673 A.2d 866, 869 (1996) (explaining there is no essential difference between suppression rulings and rulings on motions *in limine* to admit or exclude evidence; in both cases, pretrial rulings are handed down which admit or exclude evidence at trial).

With respect to pre-trial rulings on the admissibility of evidence under Rule 404(b), our Supreme Court explained that the trial court should make pretrial Rule 404(b) determinations only when the trial judge finds it manifestly appropriate. **Commonwealth v. Hicks**, 625 Pa. 90, 91 A.3d 47 (2014) (stating value of evidence is fluid and prejudice is in flux until record is full and developed at trial). "[A] deferred, correct decision is better than an early, incorrect one." **Id.** at 101, 91 A.3d at 54. Pennsylvania law makes clear Rule 311(d) applies when the court actually makes a pretrial ruling to preclude or exclude the Commonwealth's proposed evidence. **See generally Commonwealth v. Jordan**, 125 A.3d 55 (Pa.Super. 2015) (*en banc*), *appeal denied*, 635 Pa. 741, 134 A.3d 55 (2016).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Margherita Patti-Worthington, P.J., we conclude the Commonwealth's issue as to Count 1 merits no relief. The trial court opinion fully discusses and properly disposes of that claim. (**See** Trial Court Opinion, filed July 26, 2017, at 18-33) (finding: Rule 404(b) exceptions do not apply to Count 1, absent any direct and logical connection between Appellee's prior acts and those crimes currently charged; Commonwealth's evidence involves alcohol abuse and marital strife; despite possible relevance of prior bad acts evidence, Commonwealth failed to connect Appellee's drunken outbursts and anger directed at his wife to homicide of Child; Appellee's prior incidences with his wife showed no intent, motive, plan,

scheme, or design to kill Child and reveal no malice or ill will against Child; Commonwealth's prior bad acts evidence might establish Appellee has been violent when drunk, and that he inferentially murdered Child because he was drunk at hospital on day in question; Commonwealth failed to develop necessary close factual nexus between prior bad acts and circumstances surrounding Child's death; as to Count 2 (EWOC) and Count 3 (REAP), it is unclear what other evidence Commonwealth seeks to admit as direct evidence; much of Commonwealth's proposed Rule 404(b) evidence shows Appellee's history of issues but is devoid of any relation of those issues to Child; court cannot properly evaluate Commonwealth's proposal as to Counts 2 and 3, until record is more fully developed at trial; without ruling on merits, court took matter under advisement as to Counts 2 and 3, until trial when Commonwealth might offer relevant direct evidence pertaining to Counts 2 and 3).  We accept the court's analysis and affirm its decision as to Count 1. The Commonwealth certified its appeal as to Counts 1, 2, **and** 3; but without an adverse ruling concerning the Commonwealth's proposed evidence related to Counts 2 and 3, the Commonwealth has no appeal as of right under Rule 311(d) regarding Counts 2 and 3. ***See Jordan, supra***.  Accordingly, we affirm as to Count 1, based on the trial court's opinion, and quash the appeal as to Counts 2 and 3.

Order affirmed; appeal quashed in part. Case remanded for further proceedings. Jurisdiction is relinquished.

Judge McLaughlin joins this memorandum.

Judge Ransom did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/3/18

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA    :  NO. 1521 Criminal 2016
    :
vs.    :
    :
ANTHONY GUDINO,    :  OMNIBUS PRE-TRIAL MOTION
    Defendant    :

## OPINION

This matter comes before the Court on Anthony Gudino's ("Defendant") omnibus pretrial motion and the Commonwealth's motion for tender years hearing and to permit testimony by contemporaneous alternative method. The case arises out of the death of a 5-month old female infant, A.G. The procedural history and facts according to the Commonwealth are as follows:

On May 6, 2016, the Stroud Area Regional Police were dispatched to the Pocono Medical Center (PMC) on a report of a 5 month old female infant who had just arrived at the emergency room with a traumatic injury. Upon arrival, it was learned that at approximately 12:07 that afternoon East Stroudsburg University Sergeant Jim Hughes ("Hughes") had been walking to his patrol car behind the Wawa on Prospect Street when he was approached by a male, later identified as the Defendant. carrying an infant, A.G., in his arms. Defendant said to Hughes "my baby is not breathing right" and "take me to the Hospital." Hughes asked him if his baby was breathing and Defendant responded "yes." They got into his patrol car and drove to the PMC Emergency Room approximately 30 seconds away.

Hospital staff reported to police that when A.G. arrived she was limp, unresponsive, and was not breathing. Upon arrival A.G. was considered to be in critical/grave condition. Her

1

injuries included: hemorrhaging of the occipital, right parietal, and left parietal areas of the head, fracture to the occipital area of the skull, one blown pupil and one non-reactive pupil. The hospital staff told officers that these injuries were consistent with blunt force trauma. Additionally, the cause of the fracture on the back of A.G.'s head was suspected to be the result of blunt force trauma. Various tests were performed upon A.G. to gauge her condition. CT scans showed multiple areas of brain injury including both old and new bleeding throughout the brain. Efforts were made to reduce the bleeding but were unsuccessful and A.G. never regained consciousness. A.G.'s heart also stopped several times during these efforts. Arrangements were made for a life flight to Lehigh Valley Hospital, but A.G. passed away while those efforts were underway and the flight was canceled.

Detective Richard Wolbert ("Wolbert") arrived at the hospital shortly after the first officer arrived. While at the hospital, Wolbert spoke with Defendant twice. During both encounters Defendant was free to leave and indicated that he would voluntarily answer Wolbert's questions. During their second conversation, in a private room, Defendant reiterated what he had told hospital staff; namely, that he was home alone with A.G. and she was drinking from a bottle in her baby swing when he heard a gurgling sound. Defendant stated that when he went to check on A.G. she was not breathing. He unclipped the safety belt, lifted the child up and found her to be limp and unresponsive. He lifted her to his ear and heard a heartbeat. He said he laid the child on the bed and attempted to get the child to breath by giving her breaths and pushing on her chest. At that point Defendant took A.G. out of the apartment and found Officer Hughes behind the Wawa. During his interview with Defendant, Wolbert noticed that he

2

appeared to be under the influence of something[1]. Wolbert observed Defendant's eyes were slow to react and he had a slight odor on his breath. Defendant admitted to smoking marijuana earlier but refused consent to a drug test.

After his interview with Defendant, Wolbert left the interview room and went to the trauma center to check on A.G. Wolbert took photographs of A.G. and spoke to medical staff regarding her condition. During this time Wolbert observed bruising on A.G.'s forehead and the medical staff informed him that the bruising was an indicator of head trauma. Hospital staff also advised him that they had noticed signs of child abuse during their treatment of A.G. Wolbert then left the hospital and went to Defendant's home to make sure it was secure. A short while later Wolbert received a phone call that A.G. had passed away. Wolbert went with a uniformed officer and located Defendant in the alleyway leading away from his apartment near the Wawa, and took him into custody.

Upon arrival at the Stroud Area Regional Police Station Defendant was interviewed by Detective Sue Charles ("Charles"). Charles conducted two recorded interviews of Defendant. Charles gave Defendant his Miranda warnings prior to the commencement of the questioning and Defendant verbally waived his Miranda rights and signed a written waiver. Defendant requested a third interview with Charles on May 11, 2016 at the Monroe County Correctional Facility. Defendant was again advised of his Miranda rights and waived those rights in a written waiver at the onset of the interview. A compact disc of the interviews, transcripts of the interviews, and Defendant's written Miranda waivers were offered into evidence at the Omnibus Hearing as Commonwealth Exhibit's 1, 2, 3, 4, 5, and 6. ("Com. Ex.")

---

[1] Hospital Staff also noted in the hospital treatment records that Defendant appeared to be under the influence of alcohol

Later that evening police obtained a search warrant for Defendant's blood to determine if any substances were in his system. Defendant's blood was drawn at 10 PM on Friday May 6, 2016. The results of the blood testing were admitted at the Omnibus Hearing and revealed that Defendant's blood alcohol content was .06%. Com. Ex. 9. Additionally, the Commonwealth made a motion to supplement the record to include a toxicology report relating Defendant's blood alcohol level back to the time of the incident in question. Said motion was granted on April 6, 2017. The toxicology report showed that Defendant's blood alcohol level as of 11 AM on May 6, 2016 was in the range of 0.16% to 0.34%.

Defendant's son, A.J. aged 6, was also interviewed. This interview took place on May 10, 2016 at The Children's Advocacy Center of Northeastern Pennsylvania and was videotaped. A DVD containing the video of the interview was admitted into evidence at the omnibus hearing as Com. Ex. 15.

Defendant was charged by Criminal Information on July 15, 2016 with: Criminal Homicide[2], Endangering the Welfare of Children – Parent/Guardian/Other Commits Offense[3], and Recklessly Endangering Another Person[4]. On September 19, 2016 the Commonwealth filed a Motion for Status Conference. On September 21, 2016, We scheduled a status conference with Counsel. On October 31, 2016 at the date and time scheduled for Status Conference, Defendant filed an "unopposed motion to reschedule hearing." The status conference was rescheduled to November 18, 2016. At the status conference both parties were directed to file all pretrial motions on or before December 21, 2016.

---

[2] 18 § 2501 §§ A
[3] 18 § 4304 §§ A1
[4] 18 § 2705

4

On December 14, 2016, Attorney William A. Watkins, Counsel for Defendant filed a Motion to Withdraw as Counsel arguing that Defendant could no longer afford private counsel. On December 22, 2016, We granted said motion and appointed the Monroe County Public Defender's Office as counsel for Defendant. The Monroe County Public Defender's Office simultaneously filed a Motion to Appoint Conflict Counsel stating that their office had previously represented A.G's mother, Jasmin Santiago, in a proceeding involving the same parties. A full evidentiary hearing on the motion to appoint conflict counsel was scheduled for January 13, 2017. After the hearing, the Public Defender's office was granted leave to withdraw and Attorney Jeffery Velander was appointed as counsel for Defendant.

Defendant filed the present omnibus pretrial motion on December 21, 2016. The Commonwealth also filed its motion to permit A.J. to testify via contemporaneous alternative method and motion for in camera hearing to determine whether the Tender Years Rule would apply. A hearing on both parties' motions had been scheduled for January 6, 2017 but was continued to February 27, 2017, pending disposition of the conflict counsel issue.

After a hearing on both parties' motions, held on February 27, 2017, and upon agreement of counsel for the Commonwealth and Counsel for the Defendant We ordered the following:

1. Count I of Defendant's Omnibus Motion to Amend Information was withdrawn and Dismissed;

2. Count III of Defendant's Omnibus Motion for Discovery was Dismissed as Moot;

3. Count VI of Defendant's Omnibus Motion to Extend Time for Supplemental Pretrial Motions was Denied;

4. Count VII of Defendant's Omnibus Motion for Appointment of an Expert was Granted;

5. Count IX of Defendant's Omnibus Motion to Continue Trial Date from March to June 2017 was Dismissed as Moot; and

6. Count X of Defendant's Omnibus Motion for List of Witnesses was Dismissed as Moot.

A hearing on counts II, IV, V, VII of Defendant's omnibus pretrial Motion and on the Commonwealth's Motion to permit testimony by Contemporaneous Alternative Method and for In Camera Hearing was scheduled for March 21, 2017. On March 21, 2017, after the hearing, We ordered the following:

1. Hearing for the purpose of an in camera interview with A.J. and any other testimony necessary on the Commonwealth's motions is scheduled for May 25, 2017;

2. The Record of Defendant's omnibus motion for change of venire remains open until April 7, 2017 for the submission of Defendant's Exhibit 1, proof of publicity[5];

3. Counsel for the Defendant to submit a memorandum of law on the remaining issues on or before April 17, 2017, and the Commonwealth shall submit a memorandum of law on or before April 28, 2017.

The Commonwealth submitted its memorandum and a motion to supplement the record on April 3, 2017. Said motion was granted on April 6, 2017. As of this time Defendant has failed to file a brief.[6]

---

[5] Defense Counsel filed a Petition for Extension of Time to Supplement Additional Evidence regarding his motion for change of venire. Said Motion was granted and We ordered Supplemental Records to be submitted by April 24, 2017.

[6] Defense Counsel was reminded again at the hearing on March 25, 2017 to submit his brief.

6

On March 25, 2017, a hearing was held to determine whether prior hearsay statements by A.J. should be admitted at trial, and whether he should be allowed to testify at trial by contemporaneous alternative method. The Court heard testimony from Attorney Lara Mammana Kash ("Ms. Kash"), the attorney assigned as guardian *ad litem* for A.J. in the dependency proceeding, and spoke with A.J. in chambers. During the hearing the Commonwealth submitted the transcript of the videotaped interview from the CAC as Com. Ex. 1. The Defense submitted a copy of a letter from Dr. Daniel, a forensic pathologist, which outlines further steps needed for the Defense experts to review and issue their reports, as Defense Exhibit 1. ("Def. Ex.")

After review of the record, argument at hearing, and the Commonwealth's brief, we are ready to dispose of this matter.

## DISCUSSION

### Motion to Suppress Statements

Defendant asserts two claims in his Motion for Suppression of Statements, as follows: (1) "Under the circumstances of the interrogations of the defendant, his statements were made in custody"; and (2) Despite the fact that Defendant was being custodially interrogated, the officers did not inform him of his Miranda Rights." Def.'s Pretrial Motions p. 11-12

Defendant's motion is ambiguous with respect to the statements he seeks to suppress. The statements that may be at issue are as follows: 1. Defendant's statements to Detective Wolbert at PMC 2. Defendant's statements to Wolbert in the police vehicle; and 3. Defendant's statements to Charles.[7]

---

[7] Defendant made statements to Detective Hughes, the officer Defendant approached while holding AG and asked him to drive them to the hospital. The only statement Defendant made is that his daughter was having difficulty

## STATEMENTS AT PMC

The Pennsylvania Superior Court has recognized:

> the factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring *Miranda* warnings.

Com. v. Mannion, 725 A.2d 196, 200 (Pa. Super. Ct. 1999) (citations omitted)

Wolbert arrived at the hospital in response to a call from the Stroud Area Regional Police that an infant had arrived at the Pocono Medical Center Emergency Room, was in critical condition and not breathing. N.T. 3/21/17 p. 9. Wolbert located Defendant in the hallway of the ER outside the nurses' station, and asked him "what had happened, if something happened" to AG, to which Defendant replied "no;" in response, Detective Wolbert asked Defendant if he could talk with him, and Defendant freely agreed to do so in a private, "quiet" room[8] located in the ER section of PMC. Id. at 6-8, 11-12.

The basis for speaking with Defendant in the room was to ascertain "what happened, how he ended up there." Id. The interview in the quiet room was approximately 30 minutes in length Id. at 14.

Defendant was not transported to the quiet room, but accompanied Detective Wolbert freely after agreeing to speak with him. While at PMC, Defendant was never restrained, nor was he ever subject to the show, use, or threat of force. During Wolbert's questioning of Defendant in

---

breathing. The facts do not require separate analysis beyond this footnote, as there is no indication Defendant intended his statement to Hughes as a subject of his motion to suppress.

[8] Wolbert during testimony referred to the room where he and the Defendant agreed to speak as the "quiet room" and "family room" Omnibus hearing transcript at N.T. 3/21/17 pp. 11-12.

8

the quiet room, Wolbert observed Defendant was "very nervous" and "his eyes were not very reactive;" Wolbert suspected Defendant was "under the influence of something." N.T. 3/21/17 p. 14. Wolbert asked Defendant "if he had anything to drink, had smoked anything, if he had done anything," to which Defendant replied that he had smoked marijuana the day before. Id. at 15. Wolbert requested Defendant's consent to a blood sample, which he refused." Id. Defendant left the room after Wolbert left the room to check on AG. Id. at 15-16.

Defendant was not in custody at any point at PMC; accordingly, Defendant was not entitled to Miranda warnings before he made statements to Wolbert in the hallway and the quiet room, and these statements will not be suppressed. Next we will review Defendant's statements in the police vehicle while in the police custody of Wolbert and Hettel.

## STATEMENTS WHILE TRANSPORTED BY WOLBERT AND HETTEL

On May 6th, 2016, after AG died and Wolbert learned from medical personnel that AG's condition was consistent with blunt force trauma, Wolbert and Corporal Nevil ("Nevil") located Defendant and arrested[9] him at the Wawa near his apartment. Defendant made statements while being transported in the police vehicle. The following is a timeline of subsequent events relating to Defendant's transportation by police:

1. Wolbert and Nevil brought Defendant back to the police station. Id. at 17.
2. After the criminal complaint was prepared, Wolbert and Hettel transported Defendant, stopping first at the residence to serve a search warrant. The house was to be searched. N.T. 3/21/17 p. 18.
3. Wolbert "may have" informed Defendant about what the charges were. Id. at 19.
4. When Hettel exited the car to serve the warrant, Defendant spontaneously asked Wolbert, "Do you think they will plead this down to manslaughter?" Wolbert replied and said he

---

[9] Although Defendant avers his statements were made while in custody, Defendant does not challenge the legality, i.e., the justification (probable cause, arrest warrant, etc.) for Detective Wolbert to place Defendant into custody.

9

"didn't know…it was way too early to tell;" Defendant then asked Wolbert how much time he would get approximately." Id.

5. After Hettel returned to the car, Wolbert and Hettel transported Defendant to the DUI center because Wolbert also had a search warrant to have Defendant's blood drawn. Id. at 20.

6. Wolbert and Hettel transported Defendant to Magisterial District Judge Fluegel for his preliminary arraignment. Id.

7. Wolbert and Hettel transported Defendant to the Monroe County correctional facility. Id.

8. Defendant asked again, "Do you think they will plead this down to a manslaughter? How much time do you think I would get?" Defendant added, "I can't believe I'm going [to] spend my birthday in jail." Id.

The sole issue regarding the above statements is whether Wolbert, by informing Defendant of the charges and replying to Defendant that he (Wolbert) "didn't know" and "It's way to early to tell" in direct response to Defendant's manslaughter plea inquiry, were tantamount to an interrogation. In other words, we ask whether the statements by Wolbert to the Defendant are the functional equivalent of custodial questioning, or words that would reasonably elicit an incriminating response from defendant.

It is not disputed that Defendant's statements were not in response to questioning by Wolbert or Hettel, nor is it disputed that Defendant was in custody at the time Wolbert arrested and transported Defendant from Wawa, and that Defendant was not read Miranda rights during transportation. Id. at 19-21.

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police *(other than those normally attendant to arrest and custody )* that the police should

10

know are reasonably likely to elicit an incriminating response from the suspect.(emphasis added). Com. v. Lark, 477 A.2d 857, 860–61 (1984) (citing Com. v. Chacko, 459 A.2d 311, 315 (1983)

In Lark, police initially approached their suspect to inform him of his rights and the charges against him. The Court determined this police conduct was "normally attendant to arrest and custody" and therefore, did not violate his apparent wish to remain silent. Id.

Similar to the police conduct in Lark, Wolbert informing the Defendant of the charges against him amounts to no more than police conduct "normally attendant to arrest and custody." As such, these statements were not interrogation of Defendant. We also apply this reasoning to Wolbert's statement that he "didn't know" and "it's way too early to tell" in response to Defendant's questions to him about the possibility of a manslaughter plea and how much time he would get.

Although Defendant's statements during his transportation by Wolbert and Hettel were made while in custody, they were not the product of interrogations; as such, Defendant's motion to suppress these statements is **DENIED**. Next we will examine Defendant's statements to Detective Charles.

## DEFENDANT'S STATEMENTS TO DETECTIVE CHARLES

Detective Charles interviewed Defendant twice on May 6, 2016. She interviewed Defendant a third and final time on May 11th. It is undisputed that all three interviews were recorded[10], transcribed,[11] and had occurred when Defendant was in police custody. As it is not

---

[10] These interviews are the only ones that correspond with Defendant's reference in his motion to suppress, that "there were multiple recorded interrogations." Defendant does not challenge the legality of the recordings; Also our review of the record indicates Defendant was clearly aware he was being recorded from the start of each interview with Detective Charles.

11

disputed that Defendant was in custody, our focus concerning these three interviews is whether Defendant was properly informed of his Miranda rights, and if so, whether he waived them.

Charles affirmed during her credible testimony that during Defendant's first interview, she read his Miranda Rights, and Defendant subsequently executed a waiver of those rights at the beginning of the interview. N.T. 3/21/17 pp. 30-31. Defendant at the beginning of the interview acknowledged that Charles read him his Miranda Rights and his agreement to speak with her. Com. Ex. 4 p. 2. Defendant additionally executed a written Miranda waiver form. Com. Ex. 2.

With respect to this first interview, Defendant's claim that Defendant was not informed of his Miranda rights is baseless.

Charles conducted a second interview of Defendant approximately 10 or 15 minutes after the conclusion of the first interview, after Defendant requested to speak with her again. Com. Ex. 4 pp. 2, 19-21. Charles testified credibly that she reminded Defendant that he was still entitled to his Miranda rights Def. Pretrial Motions p. 31. At the beginning of their interview she stated that she had previously read him his rights, and asks if he is still waiving them and wishes to speak with her. Defendant replied in the affirmative. Com. Ex. 5 p. 2.

Detective Charles reminded Defendant of the previous Miranda rights she provided and that Defendant acknowledged the previous warnings and agreed to proceed. Charles did not actually re-read Defendant his Miranda rights at the beginning of the second interview.

---

[11]We reviewed both the audio record and the transcript, Com. Ex. 1 and 4, respectively. We note the audio record is consistent with the transcript, and therefore, for practical referencing, we may cite to the transcript of the recordings rather than the audio recordings themselves.

12

"This Court has never created a prophylactic rule that a suspect must be rewarned of his constitutional rights every time a custodial interrogation is renewed. Rather, we view the totality of the circumstances in each case to determine whether repeated warnings are necessary where the initial warnings have become stale or remote." Com. v. Scott, 752 A.2d 871, 875 (2000), citing Com. v. Bennett, 282 A.2d 276, 279 (1971)

In considering the totality of the circumstances, the Court assesses the following factors: (1) The length of time between the warnings and the challenged interrogation, (2) whether the interrogation was conducted at the same place where the warnings were given, (3) whether the officer who gave the warnings also conducted the questioning, (4) and whether the statements obtained are materially different from other statements that may have been made at the time of the warnings." Id. (numbered parentheses added.)

"These criteria, though not mandatory, guide us in determining whether there has been a "clear continuity of interrogation." Scott, 752 A.2d at 875 (2000) citing Com. v. Hoss, 283 A.2d 58, 66 (1971)

In Com. v. Bennett, the Pennsylvania Supreme Court held that warnings were not "stale" when they were issued shortly less than five hours before the challenged interrogation, defendant was moved a distance of a few miles, and the challenged statement was given to an officer other than the officer issuing the warnings. Bennett, 282 A.2d at 280 (1971)

Here, Defendant's statements in the second interview would have occurred no more than approximately two hours after Defendant was given his Miranda warnings and executed a waiver of the rights during the first interview Com. Ex. 4 pp. 2, 131. Com. Ex. 5 pp. 2, 11. This is less than half the difference in time elapsing between the warnings and challenged statements

13

presented in <u>Bennett</u>. This weighs in favor of a determination that there was "a clear continuity of interrogation."

Additionally, unlike <u>Bennett</u> in which the officer conducting the second interrogation was not the same person who issued the warnings in the prior interview, Charles read Defendant his Miranda warnings during the first interview at the station and also conducted the second interview at the station. She conducted the second interview at Defendant's request. Finally, although she did not re-read the warnings verbatim, Charles did remind Defendant of his rights and asked him again if he waived them. This weighs in favor of our determination that under the totality of the circumstances there was "a clear continuity of interrogation." We next consider whether there were material differences between the statements Defendant made during the first and second interview.

In <u>Bennet</u> the Pennsylvania Supreme Court cites a Maryland Court of Special Appeals case, <u>Brown v. State</u>, to provide an example of "materially different" statements by a suspect who was interviewed twice, but was issued Miranda warnings only during the first interview. 252 A.2d 272, 276 (1969) In <u>Brown</u>, the suspect in the second interview made more incriminating statements than he did in the first interview; particularly, he admitted for the first time to having stabbed the victim, while in the first interview he did not admit to committing physical violence against the victim. During his second interview, Defendant recalls one "huge potential" incident in which:

> I was walking with my daughter throughout the house, or whatever, and, uhm, taking care of business, cleaning up, or whatever, and, you know, she was—you know, she basically didn't want to be laying down. So while walking through the house, or whatever, she had,

14

uh, tapped her head against the wall while I was, uhm, like fighting off the dogs[12], uh, that they were making a big mess throughout the house." Com. Ex. 5 p. 3.

During the first interview with Charles, Charles asked whether Defendant ever noticed any indication of injury to AG; Defendant responded: "I mean, because—I mean, to my knowledge, completely, she's, you know, never like banged her head on something, you know like—or like maybe substantial. Maybe she might've like tapped her head, you know, like —like maybe a time or two whatever." Com. Ex. 4 p. 140.

Although Defendant in the second interview adds new details in a "potential" incident involving AG, there is not a material difference in the above statements. In both interviews, Defendant indicates that AG may have, on a prior date, "bumped" or "tapped" her head.

One notable difference between the first and second interview, however, is that during the first interview, Defendant indicated that nothing had occurred to AG, because "she would have started crying." Id. at 126. In the second interview, he stated that after the "huge potential" that AG bumped her head on one occasion, she cried for "maybe about a minute or less." Com. Ex. 5 p. 8.

Similar to the police issuing of warnings to their suspect in Brown, Charles read Defendant his Miranda warnings during the first interview but not the second interview. Also like the first and second interrogation in Brown, this case presents differences in the content of Defendant's statements between the first and second interview.

However, unlike Brown, in which the suspect admitted during the second interview for the first time that he stabbed the victim, the discrepancies and new information presented in this case are minimal. Simply, they do not rise to the level of being materially different as to lack "a clear continuity of interrogation." Also unlike the Police in Brown, the interrogator in this case,

---

[12] Defendant, when asked what kind of dogs he has, replied that "right now we have a little poodle" Com. Ex. 5 p. 3.

15

Charles, reminded Defendant that she provided Miranda rights to him previously and asked Defendant to confirm that he is still waiving those rights, which the Defendant acknowledged.

The totality of the circumstances surrounding Defendant's first and second interview with Charles indicates the Miranda warnings Charles provided Defendant during the first interview were not stale by the conclusion of their second interview. A clear continuity of interrogation existed with respect to the first and second interviews. Therefore, Defendant's motion to suppress his statements from his second interview with Charles is **DENIED**.

In the third and final interview, Charles informed Defendant of his Miranda rights: "I advised him from beginning to end again with Miranda." N.T. 3/21/17 p. 31. Defendant again executed a written waiver of his Miranda rights. Id. at 31-32. Com. Ex. 3. Defendant's claim that he was not informed of his Miranda rights is baseless with respect to Detective Charles's third interview.

Therefore, Defendant's motion to suppress statements from all three interviews with Charles is **DENIED**.

### Change of Venire

Defendant also brings a Motion for Change of Venire. Defendant argues that there has been extensive pre-trial publicity which may prevent the impaneling of a fair and impartial jury in Monroe County. In support of this motion, Defendant has submitted evidence of prior media coverage. Thus far, it is clear that there was, especially at the time of arrest, some coverage of the case.

The decision whether to change venue or venire is committed to the discretion of the trial court. Com. v. Tedford, 567 A.2d 610, 618 (Pa. 1989). A motion for a change of venue or venire will not be granted unless it can be shown that pre-trial publicity resulted in actual

16

prejudice preventing the impaneling of an impartial jury. Pa.R.Crim.P. 584(A). The mere existence of pretrial publicity is not enough to warrant a change of venire. Simply because potential jurors may have heard about a case through media reports does not preclude their being able to serve on a jury. Com. v. Briggs, 12 A.3d 291, 313 (Pa. 2011) (media accounts referencing defendant's prior record and confession presumptively prejudicial). This is especially so when technology increasingly allows news of events to be transmitted globally and almost instantaneously. Id.

In certain cases, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual prejudice. Com. v. Bridges, 757 A.2d 859, 872 (Pa. 2000) (no prejudice presumed when 75 out of 125 members of the jury panel responded affirmatively when questioned concerning knowledge of the case). Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions, or re-enactments of the crime by the accused; (3) the publicity is derived from police and prosecuting officer reports. Id. However, jurors are not required to be totally ignorant of the facts of a case. Instead, what is required is a fair and impartial jury. Id. (of the 75 jurors having some knowledge of the case, only 15 had formed an opinion, and not a fixed opinion).

Even when a defendant proves one or more of the presumptive factors, a change of venire will not be required unless the defendant also demonstrates that the presumptively prejudicial publicity was "so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and there was insufficient time between the publicity and the trial for any prejudice to have dissipated. Briggs, 12 A.3d at 314 citing Com. v. Tharp, 830 A.2d 519,

17

529 (Pa. 2003)). Additionally, the Court looks at the possibility of a "cooling-off" period of media attention and the size of the population of the county, the nature of the publicity, and of the defendant's notoriety, and the alternatives to change of venire. Com. v. Roberts, 437 A.2d 948 (Pa. 1981) (publicity in the context of this case, which occurred five months prior to trial was sufficiently distant in time to not require a change of venue). The presumptive prejudice standard has not been met here.

While the presumptive prejudice standard is employed in assessing the effects of pretrial publicity, the real concern is whether actual prejudice has undermined the impaneling of the defendant's jury. See Com. v. Casper, 392 A.2d 287, 291 (Pa. 1978) (actual prejudice is the normal inquiry). Such concerns may be adequately addressed by voir dire. At this time, a reasoned consideration regarding the actual prejudice caused by media exposure is impossible. There has been little media attention since shortly after the time of Defendant's arrest. There is no way to know what level of exposure may appear closer to trial. Once the case has proceeded to the voir dire examination, Defendant may renew his motion and show actual prejudice in the impaneling of the jury. Bridges, 757 A.2d at 859. Therefore, Defendant's Motion for Change of Venire is **DENIED** without prejudice.

## Motion to Exclude 404(b) Evidence

Defendant seeks to preclude evidence of his alcoholism and prior domestic incidents. Defendant argues the evidence sought to be used at trial is not sufficiently similar, and its prejudicial effect outweighs its probative value. Def.'s Pretrial Motions, p. 5. The Commonwealth asserts multiple separate basis for the admission of this evidence. First, the Commonwealth contends it is admissible as proof necessary to support Counts two and three of the Criminal Information, Endangering the Welfare of Children and Recklessly Endangering

18

Another Person. Second the Commonwealth claims Defendant's alcoholism and domestic violence is admissible as 404(b) evidence. Specifically, they contend it is relevant to establish Defendant's state of mind, intent, motive, as well as to rebut any defense of mistake. In its brief, the Commonwealth cites several cases where this Court was upheld on appeal after allowing the admission of 404(b) evidence. They do so highlighting our ability to mitigate any prejudicial effect by giving the jury a limiting instruction, and arguing a similar instruction could be used in the present case to those previously employed and subsequently upheld. Com.'s Brief at 18.

On December 7, 2016 the Commonwealth filed a "Notice Pursuant to PA Rule of Evidence 404(b)." The Commonwealth's notice states they intend "to introduce at defendant's trial a pattern of drunken domestic violence exhibited by the defendant in the months leading up to the homicide of his five (5) month old daughter . . . ." Com. Notice of 404(b) p. 1. The evidence in question is extensive and can be found detailed in the "Commonwealth's Notice of 404(b)." We summarize the evidence as it pertains to Defendant as follows:

At the Omnibus Hearing the Commonwealth submitted Monroe County Control Center logs manifesting calls they received as well as the incident reports maintained in the files of the Stroud Area Regional Police Department. Those calls and incident reports detail the following eight interactions between police and the Defendant:

On February 2, 2016, at approximately 9:48 in the morning, the Defendant called 911 demanding that he wanted his wife out of the house because she was trying to take their daughter away. Officer Robert Breitfeller arrived. Breitfeller noticed that the Defendant appeared to be intoxicated. Another Stroud Area Regional Police Officer interviewed Ms. Santiago. She advised that the Defendant had been drinking all morning and became confrontational. She also described the Defendant as belligerent. Ms. Santiago said the Defendant began tearing up the

19

house so she decided to leave the residence with A.G.. A.G. was three months old at the date of this incident. Later that same day, at 5:46 p.m. Sargent Kenneth Nevil responded. A neighbor had called reporting a domestic dispute at the Gudino residence. Nevil noted that the Defendant was very intoxicated. Arrangements were made for him to leave the residence and spend the night at a friend's house. Ms. Santiago remained at the residence with A.G. and A.J..

The next incident occurred on February 18, 2016 at 10:28 p.m.. Ms. Santiago phoned 911. The Monroe County Control Center received the call and Ms. Santiago indicated that Defendant was drunk and was being aggressive towards her. She wanted him removed from the apartment. Shortly thereafter Officer Daniel Knowles arrived at the scene. He noted that the Defendant was intoxicated. The Defendant also accused Ms. Santiago of stealing $950 from him. Ms. Santiago, however, stated that the money was for their rent and that she had to hide it from Defendant because he would spend it on alcohol. The officer advised Defendant to go to sleep and leave things alone. However, a second call was made at 1:45 a.m. on February 19, 2016. This time Officer Steven Hettel arrived. Defendant was located in the rear alley just behind the apartment and was determined to be under the influence of alcohol to a degree that he was a danger to himself.

The next incident occurred on March 4, 2016, at approximately 3:50 p.m.. Ms. Santiago called claiming that the defendant was intoxicated and acting aggressively and that he had locked her and the children out of the house. Officer Eilber responded to the scene. He was able to get the Defendant to open the door, however, Defendant was uncooperative. Ms. Santiago was advised to go to Women's Resources. At 4:42 p.m. Ms. Santiago again called 911 and told the dispatcher that Defendant was outside of the house intoxicated. He was acting out and hitting things and she wanted him removed. Officer Eilber again reported. Eilber attempted to speak

20

with Defendant but he remained uncooperative. Defendant was advised that if the police had to return a third time he would have to leave the residence. At 8:16 p.m. that same day Ms. Santiago again called 911. This time she claimed that the Defendant had assaulted her. Defendant had been drinking and holding a knife. Officer Eilber responded for a third time. Ms. Santiago indicated that Defendant had pushed her and put her in a head lock, throwing her on a table. He had also yelled at and pushed their 6-year old son. Defendant claimed that Ms. Santiago had attacked him. Ms. Santiago was picked up by her cousin and left with the children.

The next incident occurred on March 31, 2016. At that time Defendant was observed heavily intoxicated presenting a danger to himself and others, walking in traffic with his clothing soaked from having fallen into a puddle. Ms. Santiago was contacted but she refused to take custody of him.

On April 27, 2016 several calls were made to 911. The first was at approximately 11:23 p.m.. At that point an anonymous caller had indicated that a male in his twenties was in the Wal-Mart parking lot kicking random cars and yelling. He appeared intoxicated. A short while later another call was made indicating that the individual was near the Wawa heading down Prospect Street yelling.

The last call occurred on April 29, 2016 at 4:10 p.m.. At that time Ms. Santiago reported that Defendant had just assaulted her while intoxicated and left the house walking toward the liquor store. Santiago claimed that he stole money from her purse. Officer Breitfeller responded and observed Defendant in an intoxicated state.

Further evidence was found during the search of Defendant's home. A letter dated April 29, 2016, from ERMC, Defendant's former employer, indicated that he had been terminated from his employment on April 27, 2016 because he appeared under the influence of marijuana

21

and refused a drug screen. At the time of the request Defendant did acknowledge that he was under the influence of marijuana, and would not pass a test.

Admission of evidence is within the sound discretion of the trial court. <u>Com. v. Collins</u>, 888 A.2d 564, 577 (Pa. 2005). We must first determine whether the foregoing evidence is relevant, as relevance is a threshold determination for admissibility. <u>Com. v. Cook</u>, 952 A.2d 594, 602 (Pa. 2008). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence . . . and . . . the fact is of consequence in determining the action." Pa.R.E. 401. Defendant does not challenge relevance, for good reason. The fact Defendant has a history of alcoholism and domestic violence is certainly relevant to the allegations that he was intoxicated at the time of the death of his infant daughter.

Having determined the evidence is relevant we must now determine whether this evidence is barred by Pennsylvania Rule of Evidence 404(b). Rule 404(b) generally prohibits "[e]vidence of a crime, wrong, or other act" when such evidence is offered to show "that on a particular occasion the person acted in accordance with the character" shown by that crime, wrong, or other act. Pa.R.E. 404(b)(1). There are, however, exceptions to this general rule and "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Courts have also recognized another exception—*res gestae*—to give essential background information to the crimes on trial. *See* <u>Com. v. Reid</u>, 99 A.3d 427, 451 (Pa. 2014). However, even if evidence falls within one of the exceptions, the probative value of the evidence must outweigh its potential for unfair prejudice. Rule 404(b)(2). Unfair prejudice is defined as

22

"a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Rule 403, cmt. When weighing probative value and unfair prejudice, we "may consider whether and how much such potential for unfair prejudice can be reduced by cautionary instructions." Rule 404, cmt.

All evidence against a defendant in a criminal case will be prejudicial. Com. v. Peer, 684 A.2d 1077, 1083 (Pa. Super. 1996). Our determination in this context, however, must be whether evidence is *unfairly* prejudicial. Id.; *see also* Rule 404(b)(2). While the trial court must exclude relevant but unfairly prejudicial evidence, we are "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged." Com. v. Owens, 929 A.2d 1187, 1191 (Pa. Super. 2007) (quotation omitted). In order for it to be excluded, relevant evidence must be "so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case." Id. (quotation omitted).

The Commonwealth alleges the proposed evidence is admissible under Rule 404(b)(2) to prove Defendant's state of mind, intent, motive, as well as to rebut any defense of mistake. Com. Brief p. 1.

## MOTIVE

The Pennsylvania Courts in analyzing Pa.R.E. 404(b)(2) have recognized that evidence of another crime, wrong, or act may be admitted to establish a motive for the conduct alleged. Com. v. Watkins, 843 A.2d 1203 (Pa. 2003). There must be a specific logical connection between the other act and the subject of the litigation for the evidence to be admitted. Com. v. Cox, 115 A.3d 333 (Pa. Super. Ct. 2015). The Pennsylvania Supreme Court has stated:

23

[T]o be admissible under this exception, evidence of a distinct crime, even if relevant to motive, "must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances

Com. v. Martin, 387 A.2d 835, 838 (Pa. 1978). Thus, evidence of prior altercations between a victim and the defendant is admissible evidence of motive. Com. v. Johnson, 42 A.3d 1017 (Pa. 2012). Similarly, evidence that the victim had previously filed and withdrawn charges against the defendant was admissible to establish his motive to kill her when she refused to withdraw pending charges. Com. v. Reid, 811 A.2d 530 (Pa. 2002). Evidence of drug dealing is admissible to explain motive for killing to protect drug territory. Com. v. Johnson, 838 A.2d 663 (Pa. 2003). Evidence of marital problems and infidelity is admissible to establish a defendant's motive for killing his spouse. Com.v Hairston, 84 A.3d 657 (Pa. 2014).

If there is no direct logical connection, the evidence does not fit within the exception. Com. v. Holloman, 621 A.2d 1046 (Pa. Super. 1993). For example, in a prosecution for possession and delivery of marijuana, evidence of a prior unrelated sale of marijuana was not admissible to show motive; the only connection was that both transactions were motivated by a desire for monetary gain. Com. v. Hude, 390 A.2d 183 (Pa. Super. Ct. 1978). Prior acts of violence that do not involve the victim of the charged offense are not admissible simply to show defendant's motive to harm someone; the motive must relate specifically to the charged offense. Com. v. Ross, 57 A.3d 85 (Pa. Super. Ct. 2012). When the logical connection is absent, the risk is too great that the jury will merely take the evidence as proof of the defendant's violent propensities, an unpermitted use. Id.

### INTENT OR KNOWLEDGE

Pa.R.E. 404(b)(2) permits evidence of other crimes, wrongs, or acts to be used to

24

establish intent or knowledge. These exceptions are well-established in Pennsylvania common law. Com. v. Kinard, 95 A.3d 279 (Pa. Super. Ct. 2014).

In some cases, intent or knowledge is an element of the offense charged. For example, to obtain a conviction for receiving stolen property, the prosecution must establish that the defendant knew or believed that the property was stolen. 18 Pa.C.S.A. § 3925. Therefore, evidence that the defendant possessed or offered to purchase other stolen property has been admitted to prove defendant's knowledge that the charged property was stolen. Com. v. Sparks, 492 A.2d 720 (Pa. Super. Ct. 1985). Similarly, evidence of a prior conviction for assault on the victim as well as evidence of other incidents involving the defendant and the victim have been admitted to prove intent to terrorize where the defendant was charged with making terroristic threats. Com. v. Speller, 458 A.2d 198 (1983). In a prosecution for vehicular homicide, evidence that the defendant had been convicted of DUI and had undergone alcohol awareness education was admissible to prove "malice, criminal negligence and recklessness" by showing that the defendant disregarded his knowledge of the hazards of drunk driving. Com. v. Diehl, 140 A.3d 34 (Pa. Super. Ct. 2016). Where the prosecution had to prove the defendant acted recklessly or with gross negligence in leaving her child with the babysitter, the prosecution could introduce evidence that defendant believed the babysitter was an unfit parent without establishing accuracy of that belief and could also introduce evidence that defendant paid the babysitter with marijuana and left the child in his care after he had smoked marijuana. Com. v. Chapman, 763 A.2d 895 (Pa. Super. Ct. 2000). The probative value of evidence establishing knowledge or intent is enhanced if the defendant claims innocent possession or claims to have been an innocent bystander. Com. v. Green, 505 A.2d 321 (Pa. Super. Ct. 1986). In Com. v. McCloskey, the Superior Court held that evidence of occasions on which the defendant was

25

present when teenagers consumed alcohol at her house was admissible to show her knowledge where the defendant claimed that on the occasion in question she was not aware that the teens were drinking. 835 A.2d 801 (Pa. Super. Ct. 2003). The Superior Court has stated that evidence of a prior crime is admissible to establish intent only if the charged crime grew out of or was in some way caused by the prior situation. Com. v. Aguado, 760 A.2d 1181 (Pa. Super. Ct. 2000).

## MENTAL STATE

Evidence of other acts is also often admissible to prove the defendant's mental state with regard to the victim. Com. v. Bryant, 574 A.2d 590 (Pa. 1990). Prior instances of violence directed toward the victim of the charged offense may be admissible to demonstrate the defendant's attitude toward the victim. Com. v. Sherwood, 982 A.2d 483 (Pa. 2009). For example, evidence that the defendant fired a gun at the victim an hour before shooting and killing him was admissible to prove the defendant's mental state toward the victim. Com. v. DeVaughn, 413 A.2d 660 (Pa. 1980).

The use of other acts evidence to prove intent or knowledge is often very similar to proof of motive. For example, evidence in a murder trial that the victim hit the defendant with a chair when the defendant assaulted and robbed others was admitted to show intent and ill will as well as motive. Com. v. Martin, 387 A.2d 835 (Pa. 1978). Similarly, in a prosecution for aggravated assault, evidence that the victim had reported a theft by the defendant two or three years earlier was admissible to show intent as well as motive. Com. v. Curry, 465 A.2d 660 (Pa. Super. Ct. 1983).

Other acts evidence should not be admitted if it only shows general intent; it must be directly and logically connected to the charged offense. Com. v. Seiders, 614 A.2d 689 (Pa. 1992). In Com. v. Stanley, for example, the Supreme Court rejected the Commonwealth's

26

argument that evidence of violent acts by the defendant should be admitted to prove his state of mind and intent to kill someone even though the violence had not been directed at that victim. 398 A.2d 631 (Pa. 1979). In Com. v. Murphy, however, the Supreme Court held it was proper to admit evidence that one and one half hours before he shot three people in a liquor store the defendant had invited someone else to "have a shootout." 425 A.2d 352 (Pa. 1981). The defendant's mental state was relevant because he claimed to have acted in defense of a friend. Thus, evidence of the other incident was admissible because it shed light on defendant's mental state. Id.

## ABSENCE OF MISTAKE OR ACCIDENT

Pa.R.E. 404(b)(2) is also consistent with prior Pennsylvania law in allowing evidence of other crimes, wrongs, or acts to be admitted to prove absence of mistake or accident. For example, in homicide cases where the defendant claimed that the fatal wound resulted from accidental discharge of the gun, evidence of other acts have been admitted to rebut the claim. The evidence may show lack of mistake or accident by proving motive or intent, and, therefore, may be admissible under either exception.

We find these exceptions are not applicable to the present case where, in the absence of any direct and logical connection between Defendant's prior acts and the crimes charged, the Commonwealth in effect would only prove that Defendant is a drunk and that the police were called to his residence on numerous occasions by both Ms. Santiago and by himself.

In Com. v. Roman, the Pennsylvania Supreme Court was presented with a similar factual situation. 351 A.2d 214, 219 (Pa. 1976). There, a member of a motorcycle gang was convicted of the murder of a prospective gang member. The Supreme Court reversed the trial court's

27

erroneously admitted evidence of the defendant's violent criminal acts committed in the days just prior to the murder. First, the Court held that the trial court erred in admitting testimony that the defendant, after an argument in a bar with a female patron, began to shoot his revolver at the woman's feet. The Supreme Court observed: "This incident, in short, tends to establish Roman's violent nature without showing malice toward (the victim) . . . ." Id. at 219. The Court also held that evidence that the defendant participated in a beating of another member and stole two calves, slaughtering one with a hammer, failed to bear any direct relationship to the killing concluding:

> Regardless of the (defendant's) personal character, he was entitled to have the jury determine his guilt or innocence of the crime charged in an objective manner. It is obvious to us that the erroneous admission of the evidence of the incidents unrelated to the crime on trial prevented such a determination. A new trial is, therefore, mandated.

Id. at 221. The same conclusion is required here.

The Commonwealth argues that evidence of Defendant's prior acts is admissible "for a variety of relevant purposes in support of the homicide allegations." Com's Brief p. 15. As in Roman, however, despite possible relevance, the Commonwealth fails to connect Defendant's prior drunken outbursts and anger towards Ms. Santiago to the killing of his infant child. Defendant's prior drunken outbursts with his wife show no intent, motive, plan, scheme, or design to kill his infant daughter and reveal no malice or ill will against her. The Commonwealth's proof of prior acts might only establish that Defendant has been violent when drunk, and that because he was drunk on the day in question, he inferentially murdered his daughter. The Commonwealth's own argument in its brief summarizes the sum total of their evidence as: "in this case there is a well-documented pattern of [D]efendant's behavior when he is intoxicated. In essence, the [D]efendant is a very mean drunk." Com. Brief p. 17. As the Pennsylvania Supreme Court stated in Com. v. Spruill, "fairness dictates that courts should be

28

ever vigilant to prevent the introduction of . . . evidence (of prior criminal activity) under the guise that it is being offered to serve some purpose other than to demonstrate the defendant's propensity to commit the charged crime." 391 A.2d 1048, 1050-51 (Pa. 1978).

The broad interpretation urged by the Commonwealth would defeat the fundamental purpose of the rule against admission of evidence of prior criminal acts by placing directly in issue the Defendant's drinking, and subsequent claims of domestic violence by Ms. Santiago. Pennsylvania case law requires that the Commonwealth's position be rejected.

Even when the Pennsylvania Supreme Court has determined that evidence of prior criminal acts fell within one of the recognized exceptions to the rule, it has done so only after finding a direct and logical connection to the crime charged. In Com. v. Faison, for instance, the Court upheld the admission of evidence that the defendant previously threatened and raped the victim's sister-in-law, the Court observed:

> In the present case, Mrs. Barksdale's testimony as to appellant's threats to her and his rape of her were relevant to the task of establishing appellant's settled pattern of malice as to her. The familial relationship of Dennis (the victim) to Mrs. Barksdale, the fact that appellant had been seeking Mrs. Barksdale at the Dennis home and apparently believed that the Dennis' knew her whereabouts, and the fact that the murder followed Dennis' phone conversation with Mr. Barksdale are factors which, in our view, support the connection which the Commonwealth intended to establish between appellant's settled pattern of malice towards Mrs. Barksdale and his slaying of Dennis.

264 A.2d 394, 401 (Pa. 1970). The particularity of the connections established in these cases highlights the Commonwealth's failure to establish any connection here.[13]

---

[13] Other cases recognizing exceptions to the rule barring evidence of prior criminal acts also show close connections between those prior crimes and the crime charged: e. g., Com. v. Wable, 114 A.2d 334 (1955) (in prosecution for murder of truck driver shot while asleep in cab of truck on the Pennsylvania Turnpike, evidence that three days earlier and three days later two other drivers were shot nearby in the same circumstances was admissible as tending logically to prove that the person who committed the uncharged crimes was the same one who committed the murder charged); Com. v. Minoff, 69 A.2d 145 (1949) (hostile acts and threats of violence during quarrel between church factions against member of one faction held admissible to prove murder of two other members of same

29

Recently, in <u>Com. v. Hicks</u> a divided Pennsylvania Supreme Court discussed this point in a plurality opinion: 156 A.3d 1114 (Pa. 2017)

> This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime. As early as 1872, in <u>Shaffner v. Commonwealth</u>, 72 Pa. 60 (1872), the Court described the importance of such a connection as follows:
> It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. ... To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.
>
> <u>Id.</u> at 65. *See also* <u>Wable</u>, 114 A.2d at 336–37 (1955) (there must be "such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other"); <u>Com. v. Chalfa</u>, 169 A. 564, 565 (1933) (other bad acts evidence "must show some logical connection between the offenses"). "Sufficient commonality of factors" between the other incidents and the underlying crime "dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator." <u>Com. v. Weakley</u>, 972 A.2d 1182, 1189.
> In further explaining the logical connection standard, this Court has noted "'much more is demanded than the mere repeated commission of crimes of the same class, *1126 such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature.' " <u>Com. v. Rush</u>, 538 Pa. 104, 646 A.2d 557, 560–61 (1994) (crimes containing uniquely similar attributes constitute a signature), *quoting* McCormick on Evidence, § 190 at 449 (2d Ed. 1972) (emphasis omitted). *See also* <u>Com. v. Hughes</u>, 521 Pa. 423, 555 A.2d 1264, 1282 (1989) (similarities in crimes not confined to insignificant details represent a signature); <u>Weakley</u>, 972 A.2d at 1189 (identity of perpetrator in underlying crime may be proved through other acts where they "share a method so distinctive and circumstances so

<u>Id.</u> 1125–26.

Justice Saylor in a concurring opinion addressed the specific exception of lack of accident. Justice Saylor begins his Opinion by agreeing with the plurality that "majority

---

faction); see <u>Com. v. Bederka</u>, 331 A.2d 181, 184 (1975) (threat against victim and defendant's wife arising out of wife's affair admissible to prove "state of mind toward certain persons with respect to a particular subject") (plurality).

opinions of the Supreme Court have substantially diluted the putatively stringent standard" associated with 404(b) evidence. However, he notes "the logical relevance of other bad-act evidence so employed to demonstrate lack of accident does not depend on as great a degree of similarity, as between the charged and uncharged misconduct. . . ." Id. at 1131-32. Justice Saylor analyzed lack of accident under a test new to Pennsylvania Jurisprudence but widely used in other jurisdictions, the doctrine of chances: See Id. at 1132.

> To determine whether the asserted theory qualifies [as a non-character-based theory of logical relevance], the trial judge must trace the entire chain of inferences underlying the theory. The theory passes muster if the inferential path between the item of evidence and a fact of consequence in the case does not require any inferences as to the defendant's personal, subjective character.
>
> * * *
>
> [T]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the defendant *or the defendant becoming innocently enmeshed in suspicious circumstances so frequently.*

Id. at 1133. Even under Justice Saylor's "doctrine of chances" and its reduced similarity threshold the Commonwealth's contention fails. The test proffers the evidence is introduced to show the improbability of so many accidents befalling the defendant, however, the present Defendant has not been "enmeshed in any other suspicious circumstances" as necessitated by the test. Justice Saylor concludes warning "I maintain concerns about the power of potentially inevitable character inferences associated with other-acts evidence, with requiring defendants to effectively defend mini-trials concerning collateral matter, and about the efficacy of jury instructions in this context." Id. at 1138.

Furthermore, the purpose of Rule 404(b)(1) is to prohibit the admission of evidence of prior bad acts to prove "the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). While Rule 404(b)(1) gives way to recognized exceptions, the

31

exceptions cannot be stretched in ways that effectively eradicate the rule. With a modicum of effort, in most cases it is possible to note some similarities between the accused's prior bad conduct and that alleged in the current case, the Defendant's drinking. To preserve the purpose of Rule 404(b)(1), more must be required to establish an exception to the rule—*namely a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crimes in question* . . . . The Pennsylvania Superior Court has warned that prior bad acts may not be admitted for the purpose of inviting the jury to conclude that the defendant is a person "of unsavory character" and thus inclined to have committed the crimes with which he is charged. As discussed above, the Commonwealth has failed to develop the necessary close factual nexus. Thus, the Commonwealth's argument fails and Defendant's Motion to exclude 404(b) evidence is **GRANTED**.[14]

The Commonwealth also argues that evidence of prior intoxication and domestic violence is part of the proof necessary to support Counts 2 and 3, Endangering the Welfare of Children and Recklessly Endangering Another Person. However, after reviewing the Commonwealth's oral argument and brief it is unclear precisely what evidence the Commonwealth is seeking to admit as direct evidence. Much of the Commonwealth's evidence submitted as part of their 404(b) notice shows a history of issues on the part of the Defendant but is devoid of relation to A.G., the only charged victim. As such we cannot properly evaluate the Commonwealth's argument given the record currently before us. In Com. v. Hicks, 91 A.3d 47 (Pa. 2014), the Pennsylvania Supreme Court cautioned when dealing with incomplete evidence "such evaluations should generally be deferred until there is a full record as developed at trial." Id. at 55. Thus, we will take the matter under advisement until the time of trial when the

---

[14] The Commonwealth is prohibited from using the prior acts as direct evidence of the homicide; this Court's ruling does not prohibit the Commonwealth from using the prior incidents for the limited purpose of impeachment, or rebuttal which is left to the time of trial.

32

Commonwealth may proffer relevant direct evidence as it pertains to the above counts as charged.

### Motion To Allow Testimony By Contemporaneous Alternative Method

The Commonwealth asks that we permit A.J., Defendant's son, to testify at trial by a contemporaneous alternative method. The Commonwealth avers that A.J. would suffer serious emotional distress that would impair his ability to reasonably communicate if he were required to testify in Defendant's presence.

By statute, child-witnesses are permitted to testify at a trial by a contemporaneous alternative method, instead of in the courtroom. 42 Pa. C.S.A. § 5985(a). The Court must first determine that testifying in the "presence and full view" of the finder of fact, or in the presence of the defendant, would result in the child-witness suffering serious emotional distress that would substantially impair the child-witness's ability to reasonably communicate. 42 Pa. C.S.A. § 5985(a.1). This determination can be made by, among other things, observing and questioning the child-witness, or hearing testimony of the child's parent, therapist, or other person. Id.

We held a hearing on May 25, 2017, to determine whether A.J. should be permitted to testify via a contemporaneous alternative method. At the hearing, the Commonwealth presented the credible testimony of Ms. Kash, the attorney assigned as the guardian *ad litem* for A.J. in a dependency proceeding. Ms. Kash testified that as a result of her previous interactions with A.J. she does not believe that "he would be able to testify in court" regarding his father and his home environment. N.T. 5/25/17 pp. 18-19. Ms. Kash testified that she met with A.J. for the first time within 72 hours after the incident with his father and sister. Id. at 20. Ms. Kash testified that at their initial meeting A.J. was extremely articulate and talked a lot about his friends and family. Id. at 17. However, whenever the subject of his father or the day of the incident was breached,

33

A.J. "shut down." N.T. 5/25/17 p. 18. When Ms. Kash attempted to discuss these topics with A.J. he began to "look down at the ground and curl his shoulders over" and displayed a huge shift in his prior demeanor. Id. Ms. Kash testified that she was unable to discuss these topics with A.J. because he "wouldn't open up about those things." Id. at 23. Additionally, Ms. Kash testified that she knew of other caseworkers who attempted to speak with A.J. about these same topics and encountered the same reactions she did. "Every time they would attempt to go down any of those roads... He would avoid eye contact. He would look down. It was not a topic he was comfortable with." Id. at 18.

We also spoke with A.J. *in camera* and learned that A.J. currently believes that his father is at work all week and that is why he is not at home. A.J. appeared to this Court to be extremely hesitant and uncomfortable when answering questions regarding his father. Despite indicating during the interview that he could testify in Defendant's presence, the Court observed that A.J's demeanor noticeably changed when discussing the topic of his father's alcohol use and behaviors. While A.J. initially was very sociable and communicative, the moment the subject of his father was breached he became unresponsive. A.J.'s apparent emotional fragility and clear discomfort in being examined in the *in camera* hearing lend credibility to Ms. Kash's claim that A.J. would likely be unable to testify at trial in front of Defendant. For these reasons, We find A.J. meets the criteria to testify by contemporaneous alternative method and the Commonwealth's motion to permit A.J. to testify via closed-circuit television is **GRANTED.**

<u>Motion to Allow Prior Hearsay Statements Pursuant to 42 PA. C.S.A. § 5985.1(a)</u>

The Commonwealth asks that We allow it to introduce hearsay statements made by A.J. regarding "Defendant's alcohol use and violent behaviors resulting therefrom" under the Tender Years Hearsay Act (hereinafter "TYHA") 42 Pa.C.S.A. § 5985.1. Generally, an out-of-court

34

statement is inadmissible at trial unless it falls into one of the exceptions to the hearsay rule. Com. v. Charlton, 902 A.2d 554, 559 (Pa. Super. 2006). Under TYHA, hearsay statements of child-witnesses in a criminal homicide case, as well as other types of cases, are admissible as evidence under limited circumstances. 42 Pa.C.S.A. § 5985.1(a). First, the statement must be made by a child victim or witness, who at the time the statement was made was twelve (12) years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25, 27, 29, 31, 35, or 37. Id. Next, the court must find, in an in-camera hearing, that the time, circumstances, and content of the statement provide sufficient indicia of reliability and that the statement the Commonwealth seeks to introduce is relevant. 42 Pa.C.S.A. § 5985.1(a)(1). Lastly, the child must either testify at trial or the court must deem the child unavailable as a witness. 42 Pa.C.S.A. § 5985.1(a)(2).

A proper analysis of the issue presented requires that we first discern whether A.J.'s statements given during the CAC interview are testimonial and therefore subject to the protections of the Confrontation Clause. Under the test announced in Crawford if the declarant is unavailable to testify at trial; and the declarants statement is "testimonial," then the testimony is not admissible unless the Defendant had a prior opportunity to cross-examine the declarant.. Crawford v. Washington, 124 S.Ct. 1354 (2004). Although Crawford failed to articulate a comprehensive definition of "testimonial", the United States Supreme Court did state that "hallmark of testimonial statements appears to be solemn declarations or affirmations made in a formal proceeding or formal manner, or in an official setting, for the purpose of establishing or proving some fact which the declarant expects or reasonably should expect will be used for further legal proceedings. Id at 1374.

35

Initially, We note that the CAC interview was conducted under circumstances which objectively indicate that the primary purpose was to establish or prove past events relevant to criminal prosecution. The setting was somewhat formal, the interview was not conducted by law enforcement, and there was no ongoing emergency at the time. Under the circumstances We find A.J.'s statements were testimonial. Although We find the CAC interview statements are testimonial We find that Crawford will most likely not be implicated. In their motion to permit testimony by contemporaneous alternative method, the Commonwealth has indicated that it intends to have A.J. testify via closed-circuit television. As such, Defendant will have the opportunity to cross-examine A.J. *See* Crawford 124 S.Ct. at 1354 (testimonial statements are not admissible *unless the Defendant had a prior opportunity to cross-examine the declarant.*) If the Commonwealth does not call A.J. to testify at trial, and attempts to admit these hearsay statements, Defendant may again raise this issue.

Initially, it is clear from the record that A.J. is under the age of twelve (12) therefore the first prong of TYHA is satisfied. For A.J.'s statements to be admissible at Defendant's trial, A.J. must either testify at trial or be unavailable to testify. Based on the reasons already articulated, We are permitting A.J. to testify at trial via contemporaneous alternative method. This is sufficient to meet the last prong of the TYHA analysis.

We must now determine if the out-of-court statements made by A.J. provide sufficient indicia of reliability and are relevant. The Commonwealth is seeking to admit hearsay statements made by A.J. to a forensic interviewer employed by the CAC on May 10, 2016. *See* Com. Brief p. 1. The substance of those statements is as follows:

On May 10, 2016 A.J. was interviewed at the CAC in Scranton, Pennsylvania following the death of his infant sister, A.G. The forensic interviewer asked A.J. about his father's alcohol

36

use. When the subject of alcohol was broached, A.J. indicated that he was not allowed to talk about that. N.T. 5/10/17 p. 28. Ultimately, A.J. said that Defendant does drink alcohol, more specifically whiskey, but his mother did not like it when he drinks. Id at 28-29. A.J. told the interviewer that when Defendant drinks he gets out of control and does bad things. Id at 41-42. A.J. described a series of precautions the family has to take when Defendant drinks. Id. at 42-43. Plan A involved hiding in the house until Defendant left. Id. Plan B called for the children and mother to go to their cousin's house. Id. Finally, Plan C involved going to New York in the event that the cousin could not take them in. Id. Additionally, A.J. told the interviewer that during one incident when he was drinking, Defendant grabbed his mother forcefully and caused her to bleed and that on another occasion Defendant threw him down onto an air mattress. Id. at 44-46.

During this interview it appears that A.J. becomes uncomfortable when discussing the topic of Defendant's alcohol use and behaviors. When initially asked about it, A.J. relates that he's not supposed to talk about it, and he attempts to change the topic. At times A.J. deliberately avoids answering the interviewer's questions by attempting to draw her attention to something else in the room. When discussing Defendant's behavior, A.J.'s demeanor noticeably changes; his voice become quieter and he becomes fidgety as if he is attempting to avoid eye contact with the interviewer. As A.J. recounts Defendant's aggressive nature while drinking and the physical abuse he has both seen and received, he is noticeably upset and has difficulty speaking.

## INDICIA OF RELIABILITY

In order to determine if A.J.'s statements have the requisite indicia of reliability, the Court must assess "the particularized guarantees of trustworthiness surrounding the

37

circumstances under which the statements were uttered to the person who is testifying." Com. v. Walter, 93 A.3d 442, 451 (Pa. 2014) (internal citations omitted). This assessment focuses on the truthfulness of the statements. Id. at 453. A non-exhaustive list of factors for the Court to consider in this assessment include: the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age, and the lack of a motive to fabricate. See id. at 451 (internal citations omitted). The main consideration for determining whether hearsay statements made by a child witness are sufficiently reliable is whether the child-declarant was particularly likely to be telling the truth when the statement was made. See Fidler v. Cunningham-Small, 871 A.2d 231, 238 (Pa. Super. Ct. 2005).

## THE SPONTANEITY OF THE STATEMENTS

It is clear that A.J.'s statements were not spontaneous. During the course of the interview A.J. was prompted to answer questions regarding Defendant's behavior. Some of the questions asked of A.J. were pointed or leading. Com. Ex. 15. (A.J. only mentioned that Defendant liked to drink whiskey after the interviewer asked him what beverages his father normally drinks.) Id. (Additionally, A.J. only mentioned Defendant's aggressive behavior when the interviewer asked him if Defendant ever fought with his mother or did things A.J. didn't like.) Id.

But to simply say, "These statements lacked spontaneity," and end the inquiry would be inappropriate. It is evident from both the CAC interview video and the Court's own observations of the child during his *in camera* interview, that A.J. is very easily distracted. At the CAC the interviewer had to redirect A.J.'s attention back to her questions on more than one occasion, even when discussing very insignificant topics. Id. at 10:15 (A.J. shows difficulty staying on topic when the interviewer attempts to ask what his mother's name is); Id. at 42:45 (The interviewer

38

attempts to ask A.J. about his routine in the morning before school and instead of answering the question A.J. begins pointing out different objects located in the interview room).

Because of A.J.'s distracted nature, We cannot consider the use of leading or pointed questions as the determinative factor on whether A.J.'s statements are reliable. In some instances, pointed or leading questions were the only means to elicit any response from A.J., regardless of the subject. Therefore, We find suggestive questioning here does not undermine the veracity of A.J.'s statements. The Court must next look to other factors in order to fully assess the reliability of A.J.'s hearsay statements.

## CONSISTENCY IN REPETITION

A.J.'s hearsay statements made to the CAC interviewer were not consistent with the statements A.J. made *in camera*. When asked about his father's violent behavior and alcohol use *in camera*, A.J. gave answers that directly contradicted those he gave during the interview at CAC on May 10, 2017. During the interview at CAC A.J. told the interviewer that his dad often drinks whiskey and does bad things when he drinks. N.T. 5/25/17 p. 44. A.J. also told the interviewer about one occasion when Defendant threw him down onto an air mattress and was physically abusive towards his mom. Id. When asked about his father's drinking habits and behavior during the *in camera* interviews, A.J. stated that "Dad doesn't drink at all" and never physically hurt him. Id. at 36-37, 45. In Our view, these discrepancies in AJ's statements do not undermine the reliability of the statements.

The Tender Years Hearing Act does not speak in terms of "particularized guarantees" but whether the time, content, and circumstances of the hearsay statements provide sufficient indicia of reliability. This wording leaves open the question of what types of circumstances should be

39

taken into account. For instance, We decline to categorically exclude hearsay statements simply because they are inconsistent, because the value of the traditional indicia of reliability may be compromised if the witness has been coached or prompted. Evidence of prior interrogation, prompting, or manipulation by adults may make consistency in repetition an inaccurate indicator of trustworthiness. Thus if it comes to light in a Tender Years Hearing that memory distortion might have occurred, this could impact the court's evaluation of what might otherwise constitute indicia of reliability. Com. v. Walter, 93 A.3d at 458 (2014) (Justice Saylor, concurring).

In the present case, the inconsistencies between A.J.'s statements lead the court to believe that A.J. was more concerned with saying the right thing then telling the truth. At the end of the *in camera* interview, We asked A.J. if his mom talked to him before he came into court and if she or anybody else told him not to say certain things during the meeting. N.T. 5/25/17 p. 49. A.J. stated that she told him "do not say like any bad stuff." Id. We then asked A.J. if she didn't want him to talk about bad things that happened and he responded yes, "that was mostly it." Id. at 50. In light of this, We find the discrepancies between the two statements may be the product of coaching or prompting by an outside party.

Additionally, the statements made at the CAC were made closer in time to the incident date than the statements made during the *in camera* interview. We find the statements made closer in time to the incident in question are inherently more reliable as it is presumed that one's memory will be fresher and the opportunity for fabrication lessened when the statements are made at a point in time closer to the event described. As such, the discrepancies in A.J.'s testimony could easily be the product of a lapse in memory. In consideration of the particular circumstances of this case, We must find the other factors used to assess reliability are more applicable to the assessment of the trustworthiness of the hearsay statements in question.

40

Therefore, We decline to exclude A.J.'s statements solely on the basis that they are inconsistent with his *in camera* testimony.

## THE MENTAL STATE OF THE DECLARANT

A.J. appears to have been in a perfectly calm and cogent mental state during his interview at CAC. There is no reason to believe that his state of mind would have impaired his ability to recall events, save for any issues with recall that one might typically expect from a child of A.J.'s age. Nor was there any evidence presented that A.J.'s mental state was impaired at the time he made his statements. Therefore, We cannot conclude that A.J.'s mental state at the time of the interview undermines the reliability of his hearsay statements.

## USE OF TERMS UNEXPECTED IN CHILDREN OF THAT AGE

During his interview with CAC, A.J. used terminology that is normal for a six (6) year old child. When speaking about Defendant's alcohol use and his violent tendencies A.J. described the events in terms consistent with a child his age. The only non-age-appropriate terminology A.J. used was when he told the interviewer that his father liked to drink "whiskey" When prompted on where he'd learned that word, A.J. told the interviewer that he thought it was a funny word and that his mother said he was not supposed to use it. N.T. 5/25/17 p. 41. Other than that, A.J. used words that are typical of a child his age.

## THE LACK OF A MOTIVE TO FABRICATE

No evidence has been presented that would tend to show that A.J. had a motive to fabricate. During his interview at CAC, A.J. made several positive comments regarding Defendant. It was clear that A.J. enjoyed spending time with and being around Defendant. In

41

light of the fact that we have not seen any evidence of A.J.'s motive to fabricate, and because A.J. chose to comment on Defendant's bad behavior despite the fact that they had a positive relationship, We conclude that he lacked motive to fabricate.

In considering all of the factors stated above in the particular context of this case, We find A.J.'s hearsay statements to the interviewer at the CAC have sufficient indicia of reliability under 42 Pa. C.S.A. § 5985.1.

RELEVANCY

In addition to assessing the reliability of A.J.'s statements made during the CAC interview We must also assess the relevancy of his statements. *See* Pa.R.E. 402. ("All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible."). Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence . . . and . . . the fact is of consequence in determining the action." Id. In reviewing A.J.'s CAC DVD We find the video to have only limited relevance. See Com. v. Golphin, 2017 PA Super 137 (May 8, 2017) (Prior out-of-court statements of another child regarding defendant's assaultive conduct towards him were found to be relevant and admissible under tender years exception to hearsay rule in prosecution for third degree murder, conspiracy, aggravated assault, and endangering welfare of child resulting from the death of his brother, as they showed defendant's common scheme of abusing children under his care and absence of mistake in four-year-old victim's death). A.J. makes only fleeting statements regarding Defendant's past violent behavior and there is only a passing reference to his sister A.G., the only charged victim, being present when he was pushed. However, this tenuous relevance is outweighed by the significant prejudice that would arise from a jury hearing hearsay statements that connect the Defendant to past abusive behavior not

42

concerning the charged victim. Therefore, the Commonwealth request to use the CAC video under the Tender Years exception to the hearsay rule is **DENIED**.

However, as it relates to the in court testimony of A.J., as discussed in the preceding section concerning direct evidence of Endangering the Welfare of a Children and Reckless Endangerment of Another Person, we will hold open our decision regarding the admission of such testimony until the time A.J. actually testifies. It is unclear to the Court at the present time what actions A.J. saw his father engage in and whether those actions were contemporaneous with his sister's short life. Having decided all issues before us, we enter the following Order:

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA     :     NO. 1521 CRIMINAL 2016
    :
    vs.     :
    :
ANTHONY O. GUDINO     :
    Defendant     :     OMNIBUS PRE-TRIAL MOTIONS

## ORDER

**AND NOW,** this 25th day of July, 2017, upon review of both parties' motions and in consideration of the evidence presented at the hearing and the briefs and arguments of counsel, We hereby **ORDER** the following:

1. Defendant's Motion to suppress evidence is **DENIED.**

2. Defendant's Motion to preclude Commonwealth from using the 404(b) evidence it intended to use is **GRANTED** in accordance with this Court's Opinion of this date.

3. Defendant's Motion for change of venire is **DENIED.**

4. The Commonwealth's Motion to permit A.J. to testify via contemporaneous alternative method is **GRANTED**

5. The Commonwealth's Motion to admit prior hearsay statements at trial pursuant to 42 PA.C.S.A. § 5985.1(a) is **DENIED** in accordance with this Court's Opinion of this date.

A Pretrial Conference is scheduled in Courtroom number 1 on **August 2, 2017,** at **3:00 p.m.** All Counsel and the Defendant are directed to appear.

BY THE COURT

MARGHERITA PATTI-WORTHINGTON, P.J.

cc:     Michael Mancuso, Esq., First Assistant District Attorney
Matthew J Bernal, Esq., Assistant District Attorney
Jeffrey Velander, Esq., Defense Counsel for the Defendant
Clerk of Courts
MPW2017-043

44

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**43RD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA
   Vs

ANTHONY O. GUDINO                                    1521 CR 2016

Michael Mancuso, Esq.  First ADA  X ~Imelda Olivera~  Date  7/27/17

Matthew Bernal, Esq.  ADA X ~Imelda Olivera~   Date  7/27 /17

Jeffrey Velander, Esq.  X ~mailed~           Date  7/28 /17

I, Tiffany Kozic, depose the said attached *Opinion & Order* in the above mentioned manner on July 26, 2017.

~Tiffany Kozic~
Tiffany Kozic, Clerk